**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**PHILIP WALTER ALBERTSON,**

　　　　**Plaintiff,**

**v.**　　　　　　　　　　　　　　　　**Case No. 3:13-cv-23806**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

　　　　**Defendant.**

**<u>MEMORANDUM OPINION</u>**

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-33. This case is presently before the Court on the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 12, 13). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 4, 5). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

**I.　　<u>Procedural History</u>**

Plaintiff Philip Walter Albertson ("Claimant") filed applications for Supplemental Security Income ("SSI") and DIB on October 1, 2009, alleging a disability onset date of May 31, 1995, (Tr. at 160, 164), due to lumbar disc disease, chronic pain, and

depression. (Tr. at 260). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 91-98, 106-11). Claimant filed a request for a hearing, (Tr. at 117), which was held on February 22, 2012 before the Honorable Toby J. Buel, Sr., Administrative Law Judge ("ALJ"). (Tr. at 27-86). On April 19, 2012, the ALJ issued a partially favorable opinion, finding that Claimant established disability effective October 1, 2009; therefore, he was entitled to SSI benefits. (Tr. at 11-26). However, because Claimant was not disabled prior to September 30, 2002, his date last insured for purposes of DIB, the ALJ found that Claimant was not entitled to disability benefits for any time period prior to October 1, 2009. (Tr. at 18). The ALJ's decision became the final decision of the Commissioner on July 31, 2013, when the Appeals Council denied Claimant's request for review of his DIB application. (Tr. at 1-3).

On September 26, 2013, Claimant timely filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Proceedings on January 27, 2014. (ECF Nos. 10, 11). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 12, 13). Accordingly, this matter is ready for disposition.

## II.   **Claimant's Background**

Claimant was 35 years old on the alleged date of disability onset, 42 years old on the date last insured, and 51 years old at the time of the administrative hearing. (Tr. 33). He has a GED and communicates in English. (Tr. at 33, 40, 259). Claimant has prior work experience as a carpenter and retail clerk. (Tr. at 41-45, 261).

## III.   **Summary of ALJ's Findings**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the

burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520(a)(4). First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). In the fourth step, the ALJ ascertains whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability and the burden shifts to the Commissioner to prove the final step. *McLain v. Schweiker,* 715 F.2d 866,

868-69 (4th Cir. 1983). Under the fifth and final inquiry, the Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful activity, while taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through September 30, 2002. (Tr. at 13, Finding No. 1). The ALJ acknowledged that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date. (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that prior to October 1, 2009, the date on which the Claimant became disabled, he had medically determinable impairments of low back pain status post laminectomy at L5-S1 and depression; however, the conditions did not significantly limit his ability to work and, thus, were non-severe. (Tr. at 13-16, Finding No. 3). The ALJ further found that beginning on October 1, 2009, Claimant's "degenerative disc disease of the lumbar spine, status post laminectomies, and fusion," did impose significant work-related restrictions, making them severe impairments under the Social Security regulations.  (Tr. at 16, Finding No. 4). Under the third inquiry, the ALJ concluded that Claimant's impairments, either individually or in combination, did not meet or medically equal any of the listed impairments. (Tr. at 16, Finding No. 5). Consequently, the ALJ determined that since

October 1, 2009, Claimant had the RFC to:

> [P]erform sedentary work at best as defined in 20 CFR 404.1567(a) and
> 416.967(a) except he can occasionally climb ramps or stairs, balance,
> stoop, kneel, crouch or crawl and never climb ladders, ropes, or scaffolds;
> he should avoid concentrated exposure to vibration and hazards such as
> machinery and heights. In addition, the claimant suffers from chronic
> pain, which makes it impossible for [him] to maintain attention or
> concentration sufficiently long to perform sustained activity on a regular
> and continuing basis. This conclusion is supported by Social Security
> Ruling(s) 96-9p.

(Tr. at 16-17, Finding No. 6). The ALJ determined at the fourth step that Claimant could

not perform past relevant work. (Tr. at 17, Finding No. 7). Under the fifth and final step,

the ALJ reviewed Claimant's past work experience, age, and education in combination

with his RFC to determine if he would be able to engage in substantial gainful activity.

(Tr. at 18, Finding Nos. 9-11). The ALJ considered that (1) applying the age categories

non-mechanically, and considering the additional adversities in this case, Claimant was

an individual closely approaching advanced age on October 1, 2009, the established

disability onset date; (2) he had  a limited education and could communicate in English;

and (3) transferability of job skills was not an issue because Claimant did not have work

skills that were transferable to other occupations within the RFC finding. (Tr. at 18,

Finding Nos. 8-10). Given these factors, Claimant's RFC, and the testimony of a

vocational expert, the ALJ determined there were no jobs that exist in significant

numbers in the national economy that the Claimant could perform. (Tr. at 18, Finding

No. 11). The ALJ pointed out that even if Claimant was capable of performing the full

range of sedentary work, a finding of "disabled" would be directed by Medical-

Vocational Rule 201.10. (Tr. at 18). Accordingly, the ALJ found that Claimant was

disabled as of October 1, 2009 and continued to be disabled through the date of the

opinion. However, the ALJ rejected Claimant's contention that he was disabled prior to

September 30, 2002, the date he was last insured for DIB. Therefore, Claimant's application for DIB was denied. (Tr. 18, Finding Nos. 12 and 13).

## IV.   **Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to give controlling weight to the opinion of Glenn A. Harper, M.D., Claimant's treating physician. (ECF No. 12 at 3-7). Dr. Harper opined that Claimant's back impairment disabled him from employment prior to September 30, 2002, Claimant's date last insured for DIB. Therefore, Claimant contends that he is entitled to a reversal of the Commissioner's decision on his DIB application, or remand of the matter to allow the ALJ to properly weigh Dr. Harper's opinion.

## V.   **Relevant Medical Records**

The Court has reviewed the transcript of proceedings in its entirety including the medical records in evidence, but has confined its summary of Claimant's treatment and evaluations to those entries most relevant to the issue in dispute.

### A.   *Treatment Records Related to Claimant's Back for the Period Prior to Disability*

On May 2, 1995, Dr. JoAnne Kriege wrote a letter to Claimant's family physician, Dr. Richard Dewitt. (Tr. at 1060-61). Dr. Kriege indicated that Claimant came to see her for a rheumatology consultation. Claimant was 35 years old and was the owner of a construction company. He complained of an acute stabbing pain in his left buttocks that radiated down his left leg and was unrelated to any injury. The pain worsened with sitting, standing, walking, coughing, and sneezing, and was relieved with lying down. Claimant provided a history of having a herniated lumbar disc, which was repaired by discectomy in 1991 with good results. (*Id.*). After performing a physical examination, Dr.

6

Kriege diagnosed Claimant with acute low back pain with radiation to the left leg consistent with acute disc herniation. She ordered an MRI of the lumbar spine to confirm the diagnosis. The MRI revealed changes at the L4-L5 consistent with post-laminectomy; mild disc narrowing at the L5-S1 consistent with degenerative disc disease; and a left paracentral herniated disc at the L5-S1, which abutted and flattened the adjacent thecal sac. (Tr. at 1065). Claimant received five lumbar epidural steroid injections to treat the ruptured disc. (Tr. at 851, 853, 870, 887, 896, 907).

On January 10, 1996, Dr. Kriege saw Claimant in follow-up. (Tr. at 1057-58). Claimant reported that he had some relief from physical therapy and the lumbar injections; however, he still experienced pain in his low back that radiated down his left buttock. Analgesics relieved the pain, but he wished to be more active and not have to take pain medications. Therefore, Dr. Kriege referred Claimant to Dr. John Whiffen, an orthopedic surgeon, for consultation. (Tr. at 1057).

Dr. Whiffen was able to see Claimant on February 26, 1996 and wrote to Dr. Kriege about his examination of Claimant. (Tr. at 1053-54). Dr. Whiffen reviewed Claimant's history of back pain, back surgery, recent back issues, injections, and therapy. He noted that Claimant's pain now radiated from his low back to the center of his posterior thigh and calf down to his ankle. After performing an examination, Dr. Whiffen recommended surgery to decompress the nerve root by removing the disc. He mentioned that a fusion might also be necessary, although if the L4 was fused to the sacrum, Claimant's ability to work would be markedly decreased for some time. (Tr. at 1054). On March 12, 1996, Dr. Whiffen performed a laminectomy and discectomy at L5-S1. (Tr. at 925).

Dr. Whitten saw Claimant on April 22, 1996 for a six-week follow-up of his

7

surgery. (Tr. at 1046). He documented that Claimant was "doing well. He can walk up to three miles a day without problems. The only thing he can't do is twist or bend at the waist without bending at the knees and ankles." (*Id.*). Dr. Whitten advised Claimant he could pick up his level of activity at work as tolerated.

The next record pertaining to Claimant's back is dated October 15, 2001 and is an interpretation of a MRI of the lumbar spine. (Tr. at 633, 636). According to the report, Claimant was complaining of numbness in the left buttock. (Tr. at 636). The radiologist found evidence of degenerative disc disease at L4 through S1 and fibrosis at the L5/S1. (*Id.*). However, the radiologist could not rule out disc protrusion at the L4/5 level. (Tr. at 633).

On September 11, 2002, Claimant presented to Dr. Glenn Harper with complaints of chronic pain and left arm problems. (Tr. at 663). Claimant told Dr. Harper that he had undergone three back surgeries beginning with one in 1992. Approximately a year earlier, he had seen a physician who tried to get Claimant an appointment with a pain clinic, but he never heard from anyone. Since then, Claimant had been taking over-the-counter analgesics to treat his chronic low back pain, sometimes taking as many as 12-14 ibuprofen per day with large doses of Tylenol, as well. Claimant also complained of tingling in his left arm that started when he injured it cleaning out his garage one week prior. Dr. Harper examined Claimant, noting symmetrical reflexes and strength in the extremities. He did note some pain in Claimant's left shoulder with abduction greater than 90 degrees and when testing the supraspinatus muscles. (*Id.*). Dr. Harper diagnosed Claimant with a left rotator cuff strain and ordered physical therapy to prevent frozen shoulder syndrome. Dr. Harper also advised Claimant that he could not continue to take so much over-the-counter medication and prescribed Lortab to relieve

8

his pain until an appointment could be made with the pain clinic.

Claimant was evaluated by Dr. Ahmet Ozturk of the Regional Pain Management Center on October 21, 2002. (Tr. at 1107-09). Claimant described himself as a self-employed subcontractor. He was 42 years old. Claimant complained of low back pain that went down both legs to the toes with accompanying groin pain. He stated that the pain was sharp and stabbing in the low back and groin and felt like it was shooting down the legs. The pain was constant, but varied, and was exacerbated by bending, walking, standing, and sitting for long periods of time. (Tr. at 1107). At its usual, it rated a 7 on a 10-point pain scale. At its worst, it rated a 9. Dr. Ozturk noted that Claimant was a poor historian, but apparently he had three surgeries on his back, including a discectomy in 1992, another in 1995, and a lumbar laminectomy in 1997. Claimant felt the surgeries had helped, although now, he had scar tissue from the procedures. (Tr. at 1107-08). Claimant reported that he had five children, was married, and his hobbies included playing golf and playing with his children. He stated that he had come for an evaluation because Dr. Harper refused to give him any medication for his back pain until he was evaluated at the pain clinic. (Tr. at 1108-09). Dr. Ozturk ordered an x-ray of Claimant's lumbar spine, which was completed on November 11, 2002 and showed degenerative disc disease at L4, L5, L5-S1. (Tr. at 1106, 1109).

Dr. Ozturk examined Claimant on November 15, 2002 after reviewing the history and x-ray report. (Tr. at 1103-05). He observed that Claimant stood and walked without assistance. His spine was midline with normal curvatures. There was no shoulder depression or pelvic tilt, and no paraspinal muscles spasms. Claimant's gait was mildly left antalgic. He could walk on his toes, but it caused back pain. Dr. Ozturk found no joint swelling, edema, cyanosis, muscle weakness, or wasting. (Tr. at 1104). Claimant's

reflexes were symmetrical. Range of motion testing elicited some pain. At the conclusion of the examination, Dr. Ozturk diagnosed lumbar radiculopathy, left L5-S1; lumbar discopathy L4-5, L5-S1, complete collapse; SI joint syndrome, left; lumbar facet syndrome; and myofascial pain syndrome. (*Id.*). He recommended a physical therapy evaluation, nerve root blocks, diagnostic testing, therapeutic blocks, behavior modification, psychological evaluation and testing, and medications as needed. (Tr. at 1105).

On December 3, 2002, Claimant underwent a psychological evaluation as part of his pain clinic assessment. (Tr. at 1092-96). Claimant told Mr. Devlin, the licensed psychologist performing the evaluation, that he was married, lived in the area, and was employed full-time. Claimant described his business as a construction company, which he owned and operated, with five employees. The company designed, built, and repaired homes. Claimant reported no psychological problems or past mental health treatment. Claimant's mental status examination was relatively benign. Mr. Devlin felt the biggest concern for Claimant was his ability to continue working. Mr. Devlin opined that Claimant's mood management was significantly dependent on his high levels of physical activity, and his mood might become more anxious and less stable if pain prevented him from maintaining his level of physical activity. (Tr. at 1095).

In January and February 2003, Dr. Ozturk administered nerve block injections, which provided Claimant with significant pain relief. (Tr. at 1084-85, 1087-88). However, on March 11, 2003, Claimant complained to Dr. Harper that he was displeased with the pain clinic because the staff kept canceling his appointments for nerve blocks. (Tr. at 661). Dr. Harper decided to find another pain center to take care of Claimant.

The next medical record provided by Claimant is a visit with Dr. Harper dated

September 3, 2004, approximately eighteen months later. (Tr. at 660). On this visit, Claimant reported that he had lost about thirty pounds in the prior two months. He was having diffuse joint pain in his elbows, knees, shoulders, and ankles. He stated that his back pain, however, was "actually doing much better." (*Id.*).

On August 16, 2005, Claimant had an MRI of the lumbar spine performed at Dr. Harper's request. (Tr. at 632). The films showed a bulging disc with prominent degeneration at the L4 to S1 with some narrowing of the neural foramen bilaterally. (*Id.*). Based on the results, Dr. Harper sent Claimant to a neurosurgeon, Dr. Rida Mazagri, for evaluation. (Tr. at 1117-19). Claimant told Dr. Mazagri that he was having pain in the low back with left leg pain and weakness. Dr. Mazagri reviewed Claimant's surgical history and his current symptoms. On physical examination, he noted that Claimant had normal muscle strength in all four extremities, but decreased sensation over the outer side of the left leg and absent left ankle reflex. (Tr. at 1118). Claimant had a non-limping gait, mild difficulty with toe and heel walking, and mild tenderness over the lumbar spine with mild restriction of lumbar flexion and extension. Dr. Mazagri diagnosed back and left leg pain probably related to disc herniation with foraminal narrowing left L5/S1. (Tr. at 1119). After discussing treatment options, Claimant decided to proceed with surgery. Dr. Mazagri performed a posterior lumbar laminectomy L5-S1 with fusion on October 25, 2005. (Tr. at 370-71). By March 16, 2006, Claimant was noted to be recovering well from the surgery with improved symptomatology. (Tr. at 1115).

Dr. Mazagri examined Claimant in follow-up on December 14, 2006. (Tr. at 1114). Claimant complained of a recurrence of back pain, although he continued to work full-time. Claimant's physical examination revealed a normal gait with normal muscle

strength and sensation in all extremities. He had mild tenderness in the lumbar spine. Dr. Mazagri diagnosed residual back pain and left leg radiculopathy probably related to multilevel degenerative disc disease. After discussing treatment options, Claimant decided that his pain was not severe enough to merit surgery, but he might benefit from nerve block injections. (*Id.*). Claimant received an epidural steroid injection on February 5, 2007. (Tr. at 354).

On October 1, 2007, Dr. Mazagri decided to refer Claimant to Dr. David Caraway at the St. Mary's Medical Center's pain clinic to treat chronic pain associated with Claimant's multilevel degenerative disc disease. (Tr. at 1112). Dr. Caraway examined Claimant on January 14, 2008. (Tr. at 443-44). He concluded that Claimant had chronic pain following a spinal fusion and would benefit from a prescription of Lyrica and epidural steroid injections. Dr. Caraway believed that the use of a spinal cord stimulator might also be helpful. Over the next few months, Claimant received several steroid injections, which provided partial relief. (Tr. at 611). At this time, Claimant advised that he was still working and thus, he could not use a spinal cord stimulator. Instead, he wanted a prescription for Percocet. (*Id.*). Dr. Caraway subsequently became concerned that Claimant was slowly increasing his use of opioids in order to continue working as a carpenter. (Tr. at 431). Dr. Caraway suggested trying a spinal cord stimulator, and if it worked, the stimulator could be implanted permanently.

On September 17, 2008, Claimant returned to the pain clinic and complained that he was having increased pain and had been unable to work for the past four months. (Tr. at 428). Nevertheless, he decided he did not want to use the spinal cord stimulator and wanted to continue taking Percocet. Dr. Caraway decided to order a MRI and refer Claimant to Dr. Panos Ignatiadis, a neurosurgeon, for evaluation. (*Id.*) This

remained the plan on May 27, 2009 when Claimant advised Dr. Caraway on follow-up that his pain had increased and was a 10 out of 10 on the pain scale. (Tr. at 416). Plaintiff was taking Opana, Lyrica, and Percocet for pain, but these medications did not fully relieve his symptoms. Claimant told Dr. Caraway that he had become "not hireable," because the pain only allowed him to work four or five hours each day. (Tr. at 417).

A MRI of the lumbar spine was completed on July 20, 2009. (Tr. at 386-87). It showed severe chronic disc space narrowing of L4-L5 with small focal right posterolateral disc protrusion impinging on the right lateral recess and medical aspect of the right neural foramen, and a posterior annular bulge at the L3-L4 with moderate congenital spinal stenosis compounded by facet joint osteoarthritic change. (Tr. at 387). After this report was available, Claimant presented to the office of Dr. David Weinsweig, a neurosurgeon practicing with Dr. Ignatiadis. (Tr. at 379). He reviewed Claimant's history, documenting the prior back surgeries and noting that Claimant had relief from the procedures until about a year earlier when his pain returned and began to get progressively worse. He had received therapies, such as physical therapy and injections that helped temporarily, but he continued to have pain. After discussing possible treatment alternatives, Claimant elected to have surgery. (Tr. at 380). Before proceeding with surgery, Dr. Weinsweig decided to perform a lumbar myelogram/CT scan to better pinpoint the pathology. These studies revealed an annular bulge at L3-L4 with facet degeneration and mild stenosis. (Tr. at 338-39). Another bulge was seen at L4-L5, and at L5-S1, there was a vague soft tissue density that was either epidural scarring or disc protrusion.

After reviewing the films, Dr. Weinsweig had a long talk with Claimant on September 29, 2009, advising him that the chance of further surgery being helpful was

only 50/50. (Tr. at 374). He explained various surgical options, and Claimant chose to have a large fusion and decompression procedure. Claimant was told that the procedure would make his back stiff and might predispose him to further degenerative disc disease at L3-L4. Claimant accepted these risks and complications. Dr. Weinsweig was concerned that Claimant was addicted to narcotic pain medication and advised Claimant he would have to see Dr. Caraway for medication management. (*Id.*). Claimant ultimately underwent the procedure on December 3, 2009. (Tr. at 324-27).

### B. Residual Functional Capacity Evaluations and Opinions

On December 17, 2010, Dr. Drew Apgar performed a disability evaluation of Claimant at the request of the SSA. (Tr. at 710-26). Claimant reported that he was unemployed, and had been unemployed since March 2000 due to his back condition. (Tr. at 711). He provided Dr. Apgar with a history of his five back surgeries and forty epidural injections for back pain, indicating that he still took Percocet and Lyrica for pain. (*Id.*). On physical examination, Claimant appeared his stated age of 50. (Tr. at 714). He was able to get off and on the examining table, could move about, and dress and undress, but with difficulty. His posture was noted to be poor. Claimant's upper extremities showed no tremors or fasciculations, (Tr. at 717), and the joints were normal. Claimant was left hand dominant, and his manipulation bilaterally, pinch and grasp were all intact. Claimant similarly showed no abnormalities in the appearance of his lower extremities, or their joints. (Tr. at 717-18). His peripheral pulses were normal, as was his gait. (*Id.*). He could heel walk, toe walk, and squat halfway. (Tr. at 719). Claimant had normal range of motion testing, except for the lumbar spine and hips bilaterally. Dr. Apgar diagnosed Claimant with chronic pain syndrome; joint pain; myofascial pain of the lumbar spine; and lumbar degenerative disc disease. (Tr. at 720).

14

On January 20, 2011, Dr. A. Rafeal Gomez conducted a record review and completed a Physical Residual Functional Capacity Evaluation Form for the period prior to September 30, 2002, the date Claimant was last insured. (Tr. at 741-48). Dr. Gomez concluded that there was insufficient evidence to assess Claimant's RFC prior to September 30, 2002. (Tr. at 748). He was asked to look at Claimant's RFC for the period after the date last insured, and Dr. Gomez completed a second RFC Form on February 22, 2011. (Tr. at 754-61). He opined that Claimant could lift and carry 20 pounds occasionally and 10 pounds frequently. He could sit and/or walk up to 6 hours and stand up to 6 hours in an 8-hour workday. (Tr. at 755). Claimant had a number of postural limitations, as well as restrictions to avoid concentrated exposure to vibrations and hazards. (Tr. at 756, 758). This RFC assessment was affirmed on April 22, 2011 by Dr. Fulvio Franyutti after reviewing all of the medical evidence. (Tr. at 805).

On October 6, 2011, Dr. Harper wrote a letter to the SSA regarding Claimant. (Tr. at 1120). In the letter, Dr. Harper indicated that he had been asked by Claimant to inform the SSA of Claimant's "disability status" in the past, specifically in 2002. According to Dr. Harper, during that period, Claimant "was a patient of mine, and at that time, he did suffer from severe, chronic, disabling back pain secondary to degenerative disc disease. At that time he was deemed disabled and has been so since that time." (*Id.*).

## VI.    <u>Standard of Review</u>

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. The Fourth Circuit has defined substantial evidence as:

evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the ALJ, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

## VII.   **Discussion**

Claimant's sole challenge to the Commissioner's decision arises from the ALJ's rejection of Dr. Harper's October 6, 2011 letter in which he opined that in 2002 Claimant was "disabled" due to severe, chronic, and disabling back pain secondary to degenerative disc disease. (ECF No. 12 at 7). Claimant contends that the ALJ violated the "treating source rule" by disregarding Dr. Harper's opinion even though he was Claimant's treating physician. The Commissioner argues that this challenge is without merit, because the particular type of opinion offered by Dr. Harper is never entitled to

controlling weight, and in this case, the opinion was undermined by the contemporaneous record, which confirmed that Claimant continued to work well past the alleged disability date set forth in Dr. Harper's letter. (ECF No. 13 at 6-7).

Social Security regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. 20 C.F.R. § 404.1527(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* § 404.1527(c)(1)-(2). However, a treating physician's opinion on the nature and severity of an impairment is afforded ***controlling*** weight only if two conditions are met: (1) the opinion is well-supported by clinical and laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.* When a treating physician's opinion is not supported by clinical findings, or is inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight. *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. 20 C.F.R. § 404.1527(c)(2)-(6). The ALJ must provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. 1996). "Adjudicators must remember that a

finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* at *4. On the other hand, when there is persuasive contrary evidence in the record, a treating physician's opinion may be rejected in whole or in part. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Generally, the more consistent a physician's opinion is with the record as a whole, the greater the weight the ALJ will assign to it. 20 C.F.R. § 404.1527(c)(4). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (S.S.A. 1996). In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and

5. Whether an individual is "disabled" under the Act.

*Id.* at \*2.  "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at \*2. These opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole, but ultimately they are not controlling. *Id.* at \*3.

In the written decision, the ALJ explicitly addressed the October 6, 2011 opinion of Dr. Harper. (Tr. at 15). The ALJ afforded no weight to the opinion "as it is speculative and ambiguous. In addition, there are no records to support Dr. Harper's assertion, which was made many years after the fact. It is speculation." (*Id.*). The ALJ then explained why and how the evidence regarding Claimant's medical treatment, physical status, daily activities, and work history before September 30, 2002 established that he was not disabled prior to the date last insured. (*Id.*).

Clearly, Dr. Harper's opinion that Claimant was "disabled" is an opinion on a matter reserved to the Commissioner. Consequently, Dr. Harper's opinion was not entitled to controlling weight or even special significance. Nonetheless, the ALJ was required to consider the opinion and give it the weight it merited based upon its supportability and consistency with the record as a whole. The ALJ fulfilled this obligation. Indeed, the ALJ expressly considered the opinion and determined that it was

19

entitled to no weight given its lack of support in the record, its speculative nature, and its ambiguity. As the ALJ pointed out, while Claimant was diagnosed and treated for degenerative disc disease prior to September 30, 2002, his condition improved with treatment and he was able to continue working. (Tr. at 15). His earnings records and testimony substantiated that Claimant continued to work fulltime as a carpenter doing tasks at a heavy exertional level after September 30, 2002.

A review of the medical evidence demonstrates that Claimant's first documented visit with Dr. Harper was on September 11, 2002, a mere nineteen days before Claimant's date last insured. (Tr. at 663). At that time, Claimant was complaining of chronic back pain and shoulder pain. He was taking only over-the-counter medications and wanted a referral to a pain clinic. A month later, when Claimant finally saw a pain medicine specialist, he reported that he was working as a subcontractor in the construction profession, had young children, and his hobbies included playing golf and playing with his children. He subsequently received nerve block injections, pain medications, and physical therapy, all of which significantly reduced his pain symptoms and allowed him to continue working. In fact, the record contains multiple references to Claimant's continued employment well past the date last insured.  (Tr. at 611, 1092, 1107, 1114).

As the ALJ emphasized, Dr. Harper's October 6, 2011 opinion was speculative and ambiguous. Not only was the opinion rendered more than nine years after the date last insured, but Dr. Harper provided no medical findings, records, observations, or even a rationale to corroborate the opinion. Given that Dr. Harper had only seen Claimant two times prior to September 30, 2002, and the primary focus of both visits was Claimant's rotator cuff strain, (Tr. at 662, 663), Claimant is hard-pressed to

establish that Dr. Harper had longitudinal knowledge of Claimant's back condition or medical history. Dr. Harper stated in his letter that Claimant was "deemed disabled and has been so since that time," but provided no supporting information. (Tr. at 1120). For example, by whom was Claimant deemed disabled, and on what facts did Dr. Harper base his opinion that Claimant remained disabled "since that time." Moreover, Dr. Harper's memory of the time frame appeared faulty when considering that Dr. Harper did not place Claimant on any restrictions prior to September 30, 2002, nor did he suggest anywhere in his office documentation that Claimant's back condition was "severe" and "disabling." To the contrary, in his office records, Dr. Harper noted that Claimant had symmetrical strength and reflexes in his extremities, (Tr. at 663), and his lumbar pain was "improved" on Lortab. (Tr. at 662). Finally, Dr. Harper was never the primary physician attending to Claimant's back condition. Instead, Dr. Harper referred Claimant to a pain clinic and to other specialists that provided focused care related to Claimant's back. Claimant has not produced an opinion from any of these physicians substantiating that he was disabled prior to September 30, 2002 due to the severity of his degenerative disc disease.

In summary, the medical evidence indicates that Claimant's back problems, although present as early as 1991, did not progress to the point of a severe and disabling impairment until well after the date he was last insured for DIB. Having thoroughly reviewed the evidence and the opinion of Dr. Harper, the Court finds that the ALJ fully complied with the applicable regulations and rulings when he rejected Dr. Harper's opinion. In addition, the ALJ's conclusion that Claimant was not disabled prior to September 30, 2002 is supported by substantial evidence.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to the Plaintiff and counsel of record.

**ENTERED**: February 24, 2015

Cheryl A. Eifert
United States Magistrate Judge